**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KATHLEEN VITA,<br><br>For herself and the Class,<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC. AND BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC.,<br><br>Defendant. | **Case No. 1:25-cv-10420-LTS**<br><br>**Leave to file granted on October 17, 2025 (Doc. No. 26)** |

# SECOND AMENDED COMPLAINT

Plaintiff Kathleen Vita ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

## Preliminary Statement

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendants, Blue Cross and Blue Shield of Massachusetts, Inc., and Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. (together, "BCBS-MA"), including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Specifically, BCBS-MA aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by BCBS-MA (the "BCBS-MA Website"). BCBS-MA assisted in the interception of these communications by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), Twitter, LinkedIn, and other companies that provide so-called "tracking technologies."

2. The Plaintiff's and Class Members' electronic communications with BCBS-MA were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the BCBS-MA Website, including purportedly secure areas that a user needs to "log in" to the website to access.

3. BCBS-MA actively aided the secret interceptions of healthcare consumers' communications with their website by injecting hidden code into the website. During the loading of webpages on the BCBS-MA Website, BCBS-MA assisted Google, Facebook, Twitter, LinkedIn, and others to intercept communications surreptitiously. The communications were intercepted through tracking technologies hidden on many webpages of the BCBS-MA Website that permitted third parties to intercept Private Information, including, without limitation, requests for information on particular conditions and treatments, keyword searches, doctor searches, and access to the website's policyholder portal. Those interceptions enabled the third parties to know that a specific policyholder and patient sought confidential medical care and permitted the third parties to know about the nature of that medical care. That recipient, in turn, sells Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies.

4. BCBS-MA did not disclose to healthcare consumers that it helps third parties such as Google, Facebook, Twitter, and LinkedIn to intercept the contents of their individual communications with the BCBS-MA Website, nor did BCBS-MA seek or obtain their consent for such interception. Unlike other websites, for example, the BCBS-MA did not alert website users upon accessing the website that their communications are being intercepted, either through a pop-up notification or other prominent notification; instead, during the proposed class period, BCBS-MA's disclosures were themselves hidden on the website, buried in an inconspicuous link at the bottom of their webpage. Even if a user actively searched for and found BCBS-MA's purported disclosure on how it collected

and shared data, BCBS-MA **falsely** told healthcare consumers that they did **not** share the contents of any individual communications and that any activity logging is "anonymous."

5. Despite the confidentiality that healthcare consumers expect with respect to their medical conditions and care, BCBS-MA chose to put its business interests over the privacy of its patients. The unilateral disclosure of users' Private Information in this manner violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), among other statutory and common laws.

6. As described more fully below, Plaintiff and Class Members have suffered injury as a result of BCBS-MA's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing further disclosure of their Private Information.

7. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied the hospitals' motions to dismiss but reported that decision for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including

referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B and the Massachusetts Consumer Protection Act, M.G.L. c. 93A ("Chapter 93A"). *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

8. In light of the Supreme Judicial Court's decision, which Plaintiff recognizes implicates her claim here under the Massachusetts Wiretap Act, Plaintiff now amends her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, Chapter 93A, and several claims under common law.

9. The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. Here, BCBS-MA disclosed the intercepted electronic communications at issue in a manner that violated HIPAA and constituted independent torts and violations of Massachusetts law. The ECPA thus provides a private remedy for BCBS-MA's interception of electronic communications, enforceable against both the intercepting party and any party that aids such an interception.

10. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the BCBS-MA Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, Chapter 93A, and

common claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## PARTIES

11. Plaintiff is a resident of Revere, Massachusetts. Plaintiff obtains health insurance from BCBS-MA. Plaintiff regularly used the BCBS-MA Website to obtain information about her health insurance benefits, including by accessing the MyBlue patient portal.

12. As described below, BCBS-MA implemented tracking technologies that intercepted communications between BCBS-MA and healthcare consumers on nearly every page of the BCBS-MA website. The webpages Plaintiff visited on the BCBS-MA Website were among the webpages on which BCBS-MA embedded code for various tracking technologies. *See* ¶¶ 96-109, *infra* (tracking technologies embedded on MyBlue patient portal). Further detail regarding Plaintiff's communications with BCBS-MA through the BCBS-MA Website is presented in ¶¶ 112-29, *infra*.

13. Plaintiff did not consent to or authorize the use of her Private Information by third parties or BCBS-MA enabling third parties to access and use such Private Information.

14. Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a corporation located in Boston, Massachusetts. Its business includes, primarily, the sale of medical insurance to residents of Massachusetts and nearby states. The Company offers a variety of group indemnity plans, preferred provider networks, non-group plans, Medicare extension, dental, and other supplementary programs for the benefit of its members.

15. Defendant Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. is a corporation located in Boston, Massachusetts. It is a "wholly controlled subsidiary" of Blue Cross and Blue Shield of Massachusetts, Inc.

16. Defendants Blue Cross and Blue Shield of Massachusetts, Inc. and Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. effectively operate as a joint enterprise. The two

companies share employees and operate under the management of a common Board of Directors. Both Defendants share and operate the BCBS-MA Website. The only distinction in function between the two companies is that they offer separate insurance products.

## JURISDICTION

17. BCBS-MA has invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through its Notice of Removal, Doc. No. 1, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 (i.e., federal question jurisdiction).

## FACTUAL ALLEGATIONS

### BCBS-MA and Its Website

18. BCBS-MA operates health and dental insurance companies in Massachusetts. BCBS-MA sells various health and dental insurance products, including both individually and through employer-sponsored insurance plans.

19. BCBS-MA maintains the BCBS-MA Website for its business, found at https://www.bluecrossma.org/. Through that website, healthcare consumers can obtain information about insurance plans and benefits, including both the products BCBS-MA sells and individualized information about insurance subscribed to by individuals and their employers.

20. The BCBS-MA Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The BCBS-MA Website provides general information about BCBS-MA.

(b) The BCBS-MA Website provides information about healthcare issues relevant to BCBS-MA customers, communicated through specific pages for a range of medical conditions such as "Pregnancy," "Diabetes," "Mental & Behavioral Health," and "Substance Abuse Disorder," among many others.

(c) The BCBS-MA Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location, which fall within the networks of doctors covered by BCBS-MA's insurance products.

(d) The BCBS-MA Website permits healthcare consumers to access a "24/7 Nurse Line" to communicate with nurses employed by BCBS-MA.

(e) The BCBS-MA Website permits healthcare consumers to access online information about their individual insurance plans, including services obtained, medications obtained, amounts paid by BCBS-MA for medical services and medications, and information about the benefits available to the customer.

(f) The BCBS-MA Website lets healthcare consumers access their private medical information online through the MyBlue patient portal.

21. Because the BCBS-MA Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the BCBS-MA Website**

22. Healthcare consumers have an interest in preserving the confidentiality of communications with healthcare providers and insurance companies. Among the ways healthcare consumers communicate with healthcare insurance providers is through those providers' websites, such as the BCBS-MA Website.

23. Users of healthcare-related websites such as the BCBS-MA Website have a legitimate expectation and understanding that their communications with BCBS-MA through the website will be private. They also have a legitimate expectation that healthcare insurance providers such as BCBS-MA will not share with third parties their communications with BCBS-MA without their consent.

24. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers and insurance companies from using or disclosing individuals' protected health information without valid authorization from the individual. See 45

C.F.R. § 164.508(a)(1), (3). No exception allows businesses to share protected information with social media and other technology companies for marketing purposes.

25. Healthcare consumers would **not** anticipate or expect that their communications with healthcare insurance providers, including BCBS-MA, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google, Facebook, Twitter, and LinkedIn for marketing purposes.

26. Although, as described below, BCBS-MA enables third parties such as Google, Facebook, Twitter, and LinkedIn to intercept communications between BCBS-MA and healthcare conusmers, it did not inform healthcare consumers during the class period of such interceptions. The BCBS-MA Website featured no pop-up notification informing website users that their communications with BCBS-MA will be intercepted and transmitted to Facebook, Google, Twitter, LinkedIn, and other third parties.

27. During the class period, even if one specifically searched for and then located BCBS-MA's online policies concerning how website users were tracked on the BCBS-MA Website (policies that are not prominently linked or displayed on the BCBS-MA Website), those policies falsely communicated to website users that BCBS-MA did **not** engage in the precise conduct it **in fact** engaged in—specifically, facilitating third-party interception of communications between website users and BCBS-MA that permits third parties to associate those communications with actual, real-world identities of website users, and then to use the contents of those intercepted communications for the third parties' own commercial purposes, including serving targeted advertisements upon such individuals.

28. Specifically, during the class period, the BCBS-MA "Privacy" statement stated (with emphasis added):

> When you visit our website, we collect information such as IP address, geographic location, Internet service provider, and pages visited. We use 'cookie' technology to

> collect site statistical information and improve your customer experience. **Cookies set by Blue Cross Blue Shield of Massachusetts don't capture any personally identifiable information, such as your individual email address**.

This was false. As explained below, the tracking technologies BCBS-MA injected onto its website did capture personally identifiable information in that they were designed to permit third parties such as Google, Facebook, Twitter, LinkedIn, and other companies to intercept the contents of the website user's communications with BCBS-MA and associate those intercepted communications with the user's real-world identities that are known to Google, Facebook, Twitter, LinkedIn, and other third parties.

29. During the class period, the same policy also stated: "You may browse our website anonymously by choosing not to provide us with any personally identifiable information (PII), such as your name or email address, or choosing not to register during your visits to our sites." This was false. As explained below, the tracking technologies BCBS-MA injected onto its website were **designed** to permit third parties such as Google, Facebook, Twitter, LinkedIn, and other companies to intercept the contents of the website user's communications with BCBS-MA and associate those intercepted communications with the user's real-world identities known to Google, Facebook, and other third parties.

30. During the class period, the same policy also stated: "Additionally, this website may use data from cookies for a variety of internal purposes, such as studying how users navigate this website. We don't collect any personal information from cookies. Further, no other information collected from cookies can be linked back to your personal information." Again, this was false because the hidden tracking technologies that BCBS-MA injected into the BCBS-MA Website **did** enable third parties to collect personal information, including associating intercepted communications to the website users' real-world identities.

31. The same policy also referenced the use of so-called "clear gifs," but said that "[t]his website doesn't collect any personal information from clear gifs. Further, no information collected from clear gifs can be linked back to your personal information." Again, this was false, because the tracking technologies **did** collect personal information and permit third parties such as Google and Facebook to link intercepted communications to website users' real-world identities.

32. Finally, the same policy stated (with emphasis added):

> This website may use third-party web analytics services to track and analyze **anonymous** usage and **volume statistical** information from visitors to help the administration of this website, improve this website's performance, and to report website traffic. These web analytics services use cookies, clear gifs, and other web monitoring technologies to help track visitor behavior on behalf of this website. **These services don't use these technologies to collect any personally identifiable information from this website's visitors.**

These statements were false in multiple respects. The tracking technologies at issue are **not** anonymous. They permitted third parties to intercept communications between BCBS-MA and website users and associate those communications with the users' real-world identities. Those third parties could then use the intercepted communications for their own commercial purposes, including serving targeted advertising upon those individuals. In short, by falsely stating that third-party analytics services collect only "anonymous usage" information, BCBS-MA actively concealed that it aided in third parties to associate intercepted communications with healthcare consumers' real-world identities.

33. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by BCBS-MA's false and deceptive statements during the class period on the BCBS-MA's Website. The interceptions of website users' communications with BCBS-MA were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third-Parties Offering Tracking Technologies**

34. Plaintiff describes in this complaint various tracking technologies implemented on the BCBS-MA Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with BCBS-MA. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with BCBS-MA and the purposes for which interceptions are made.

35. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

36. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

37. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

38. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website

---

[1] Facebook rebranded its parent company as "Meta" in October 2021.

owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

39. Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

40. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

41. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[2]

42. Several other social media companies offer their own tracking technologies, primarily for the purpose of tracking and optimizing advertising on their social media platforms. In particular, Twitter and LinkedIn offer tracking technologies (discussed further below) that operate similarly and serve a similar function to Facebook's Meta Pixel.

43. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

44. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals

---

[2] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

have with Google's services, such as Gmail. Google maintains detailed profiles on individuals, whether or not they have a Google account.

45. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

46. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

47. Another way Google collects information to build its detailed profiles on individuals is through its "Doubleclick" "activity tags." Doubleclick was previously an independent company, founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired Doubleclick in 2007 and now operates it as an advertising division of Google. The particular Doubleclick technology that BCBS-MA uses that is important to Plaintiff's claim is called "activity tags." Activity tags operate much the same way as Meta Pixel, in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Similar to Meta Pixel, Google then associates the data collected through Doubleclick activity tags with particular individuals

to serve targeted advertising on the individual and to evaluate the efficacy of Google's advertising campaigns.

48. In summary, with respect to Google, although Google Analytics and Doublclick "activity tags" are distinct products with distinct purposes (Google Analytics is used to analyze website user behavior, and Doubleclick "activity tags" are used to optimize advertising), they both function in a similar manner, and they both intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and Doubleclick activity tags, and Google can and does use those intercepted communications for its own commercial purposes.

49. As described below, Twitter (now known as X) and LinkedIn operated similar hidden tracking technologies that BCBS-MA used extensively on its website. Their tracking technologies operate in essentially the same fashion as Google and Facebook's tracking technologies and serve a similar function—to collect and associate intercepted communications with individuals' real-world identities in order to sell the intercepted communications for purposes of individualized marketing based on the content of the intercepted communications.

**Website Tracking Technologies on the BCBS-MA Website**

50. BCBS-MA injects hidden code into the BCBS-MA Website that permits third parties to contemporaneously intercept healthcare consumers' communications with BCBS-MA. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with BCBS-MA with the website user's Facebook profile.

51. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the communications between Class Members and BCBS-MA, the contents

of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

52. BCBS-MA uses or has used several tracking technologies on its website, including Google Analytics, Google DoubleClick, Meta Pixel, and similar tracking technologies implemented by LinkedIn and Twitter. The tracking technologies are implemented through similar means.

53. Before describing how such technologies work, it is important to first define some basic technological terms.

54. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

55. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the BCBS-MA Website, as of the time of this complaint, is 216.118.191.141. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

56. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the BCBS-MA Website is https://www.bluecrossma.org/. URLs also point to specific pages on that website. Sometimes, a URL will reveal information about the particular webpage itself or the substance of the information communicated through it. Such URLs are called "descriptive" URLs because they

describe the content of the communications made through a particular page. For example, the BCBS-MA Website has a page specifically about "Pregnancy"; that page's URL is https://www.bluecrossma.org/myblue/your-health/health-and-wellness/pregnancy. One can tell from the URL itself the substance of the communication between BCBS-MA and the healthcare consumer—that the consumer is requesting information about or services in relation to pregnancy.

57. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by JavaScript code. Both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

58. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

59. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics, Meta Pixel, Twitter Pixel, and LinkedIn Insight—work as follows. In general terms, a website owner (here, BCBS-MA) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

60. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

61. When the JavaScript code causes the user's web browser to retrieve a file from the third party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.bluecrossma.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

62. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party such as Google and Facebook can then add the content of the user's communications with BCBS-MA to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the

content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

63. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

64. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and BCBS-MA contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

65. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[3] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals'

---

[3] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

data practices.[4] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

66. BCBS-MA appears to be among the healthcare websites that removed Meta Pixel in reaction to the Markup Article. Based on an archived version of the BCBS-MA website's main page, it appears BCBS-MA removed Meta Pixel from its website on or about July 1, 2022, approximately two weeks after the Markup Article was published. BCBS-MA, however, continued to secretly inject Google Analytics, Twitter Pixel, LinkedIn Insight, and several other third-party tracking technologies onto its website until several months after the complaint in this action was filed. These tracking technologies are each substantially similar to Meta Pixel code, both in their surreptitious deployment on the website and their contemporaneous interception of website users' communications with BCBS-MA.

**<u>BCBS-MA's Use of Tracking Technologies on the BCBS-MA Website</u>**

67. During the class period, BCBS-MA used various tracking technologies across the BCBS-MA Website. Several of those tracking technologies were injected into the code of all, or almost all, of the pages within the BCBS-MA Website. For example, on nearly every page of the BCBS-MA Website, BCBS-MA injected hidden code that loads Google Analytics, Twitter Pixel, and LinkedIn Insight. It also appears Meta Pixel was injected onto most pages on the BCBS-MA website before BCBS-MA removed Meta Pixel around July 1, 2022.63.

68. Several months after the initial complaint was filed in this case, it appears BCBS-MA significantly limited its use of Google Analytics and other tracking technologies. The examples provided below of BCBS-MA's deployment of Google Analytics, Meta Pixel, and other tracking technologies on the BCBS-MA reflect such deployment around the time of the original complaint in

[4] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

this action (or, as to Meta Pixel, prior to approximately July 1, 2022). BCBS-MA controls when and how it uses tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may or may not reflect BCBS-MA's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

69. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

70. Below is an image of the main landing page for the BCBS-MA Website:




71. When a user loads the main landing page for the BCBS-MA Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

72. The image below depicts the landing page for the BCBS-MA Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




73. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:




74. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the BCBS-MA Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.bluecrossma.org/Home");

(b) The title of the webpage (after the letters "dt," which includes "MyBlue Healthcare Insurance Plan | Blue Cross Blue Shield of Massachusetts); and

(c) The URL of the webpage the user visited just before accessing the BCBS-MA Website's homepage (after the letters "dr," "https://www.google.com.").

75. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual

across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, BCBS-MA).

76. Notably, when the website user's web browser intercepts the contents of communications between the website user and the BCBS-MA Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with BCBS-MA with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

77. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the BCBS-MA Website are the same.

78. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users. Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. See 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

79. As noted, BCBS-MA recently removed Meta Pixel from its website, likely in response to press coverage and Congressional scrutiny following the Markup Article. An archived version of the main page of the BCBS-MA website, saved before BCBS-MA removed Meta Pixel, confirms that BCBS-MA used Meta Pixel code on the main landing page of its website as recently as July 1, 2022.

80. When BCBS-MA used Meta Pixel, the BCBS-MA Website would load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with BCBS-MA. The contents of the communication that Facebook intercepted were similar to the contents of the communication Google intercepted through Google Analytics and Doubleclick tracking code (more specific examples follow in this complaint).

81. Like Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the BCBS-MA Website, including the URL of the webpage visited. Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier, together with other identifiers such as cookies, permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook could then use the contents of communications between the website user and BCBS-MA to serve personalized advertising to the website user in the future.

82. BCBS-MA currently uses similar tracking technologies offered by LinkedIn and Twitter, which, like Facebook, are platforms that possess information on individuals' real-world identities. Like Meta Pixel, the tracking technologies permit LinkedIn and Twitter to associate particular communications between BCBS-BA and healthcare consumers with known individuals and

then to use the intercepted communications to target advertising to known LinkedIn and Twitter users. Specific examples of how LinkedIn and Twitter's tracking technologies operate follow below.

83. BCBS-MA configured its website to intercept and retransmit to Google, Facebook, LinkedIn, Twitter, other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes. To maintain her medical privacy, Plaintiff does not describe in this complaint the specific pages she visited, but Plaintiff visited webpages within the categories of pages described below into which BSBS-MA embedded Meta Pixel, Google Analytics, and other tracking technologies. Her communications with BSBS-MA, including Private Information, were intercepted similarly to the illustrative examples set forth below.

84. The BCBS-MA Website contains dozens of subpages for specific "Conditions." For example, the BCBS-MA Website contains a page entitled "Pregnancy," designed to inform the website user about the pregnancy services BCBS-MA offers. By visiting this webpage, a user reveals to BCBS-MA that the user has some interest in pregnancy-related services (for example, the user may be pregnant or know someone who is). When the user communicates with BCBS-MA by visiting this particular webpage, BCBS-MA causes the secret interception and transmission of that communication to Google and other third parties. Below is a screenshot of the Pregnancy webpage:




85. The graphic below presents the contents of the communication between the website user and BCBS-MA that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that BCBS-MA secretly injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 1
_v: j99
a: 1941711917
t: pageview
_s: 1
dl: https://www.bluecrossma.org/myblue/your-health/health-and-wellness/pregnancy
dp: www.bluecrossma.org/your-health/health-and-wellness/pregnancy
ul: en-us
de: UTF-8
dt: Pregnancy - Benefits for Expecting Parents | Blue Cross Blue Shield of Massachusetts
sd: 24-bit
sr: 1920x1080
vp: 1244x979
je: 0
_u: wCCAAUABAAAAAAAAIC~
jid:
gjid:
cid: 1504582628.1677630569
tid: UA-87482945-3
_gid: 719300225.1677630569
gtm: 457e32r0
z: 1616895323

86. As reflected in the above screenshot, the code injected into the BCBS-MA Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting a "Pregnancy – Benefits for Expecting Parents" webpage on the "Blue Cross Blue Shield of Massachusetts" website—information that Google retains and uses for its own

commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise.[5]

87. Until recently, the same webpage contained hidden code that intercepted the user's communication with the website and retransmitted that same information to Facebook. BCBS-MA caused the secret interception and transmission to Facebook of the contents of the communication between the website user and BCBS-MA, including that the user is visiting a "Pregnancy" webpage, information that Facebook retained and can use for commercial purposes. A depiction of the contents of the communication that Facebook intercepted is depicted below (with highlighting added):




88. The same webpage, and many others on the BCBS-MA Website, also use Twitter's tracking technology, Twitter Pixel. It operates much the same way as Meta Pixel. It uses hidden JavaSript code that causes the user's web browser to intercept contents of the user's communication with the BCBS-MA website and transmit those contents to Twitter. Through the use of IP addresses and other identifiers, Twitter can associate a particular website user's intercepted communications with individuals known to Twitter (such as individuals with Twitter accounts). The contents intercepted are depicted below (with highlighting added):

[5] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.




89. The same page, and many others on the BCBS-MA Website, also use LinkedIn's tracking technology, called LinkedIn Insight Tag. The technology likewise uses hidden JavaScript code that causes the user's web browser to intercept contents of the user's communication with the BCBS-MA website and transmit those contents to LinkedIn. Through the use of IP addresses and other identifiers, LinkedIn can associate a particular website user's intercepted communications with individuals known to LinkedIn (such as individuals with LinkedIn accounts). The contents intercepted are depicted below (with highlighting added):



90. The BCBS-MA Website contains numerous similar pages on particular conditions and services. For each such page, the BCBS-MA Website aids or aided Google, Facebook, Twitter, and LiknedIn's secret interception of the contents of website users' communications with BCBS-MA, similar to the above "Pregnancy" example.

91. The BCBS-MA Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties. When an individual uses the search function, BCBS-MA aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "Addiction."[6]




[6] This is an example and does not reflect Plaintiff's personal activity on the website.

92. When a user performs this search on the BCBS-MA Website, and the results page loads, the Google Analytics code is activated, causing the individual's web browser to intercept the search terms and transmit them to Google. Below is the portion of the communication that the Google Analytics code causes to be transmitted to Google (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ **Query String Parameters** view source view decoded


v: 1
_v: j99
a: 1991780779
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.bluecrossma.org%2Fsearch%2Fnode%3Fkeys%3Daddiction%26filter%3Dmyblue%26f%5B0%5D%3Dtype%3Aorg_page_disclaimers%26f%5B1%5D%3Dtype%3Aorg_page_myblue%26from%3Dmyblue
dp: www.bluecrossma.org%2Fsearch%2Fnode
ul: en-us
de: UTF-8
dt: Search%20%7C%20Blue%20Cross%20Blue%20Shield%20of%20Massachusetts
sd: 24-bit
sr: 1920x1080
vp: 1297x979
je: 0
_u: wCCAAUABAAAAACAAIC~
jid: 2008886475
gjid: 1375072417
cid: 1504582628.1677630569
tid: UA-87482945-3
_gid: 719300225.1677630569
_r: 1
gtm: 457e32r0
z: 1687803460

93. As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google, which Google can then use for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

94. Upon information and belief, before the removal of Meta Pixel from the BCBS-MA Website around July 1, 2022, healthcare consumers' searches on the BCBS-MA Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code.

95. The Twitter and LinkedIn tracking technologies BCBS-MA used, similar to Google Analytics, intercept and transmit to Twitter and LinkedIn the precise contents of search terms a website user enters. Twitter and LinkedIn can then use those intercepted communications for their own commercial purposes, including serving targeted advertising to the individual based on the contents of their communication with BCBS-MA.

96. The BCBS-MA Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, insurance network, and location. Archived versions of the BCBS-MA Website confirm that BCBS-MA injected hidden code for Facebook's Meta Pixel into the Find-a-Doctor section of the website, which intercepted communications between website users and BCBS-MA concerning their efforts to find a doctor. Facebook could associate those communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). BCBS-MA also injected code for Twitter Pixel and LinkedIn Insight to facilitate the interception of find-a-doctor communications.

97. Portions of the BCBS-MA website are designed to be accessible only by BCBS-MA policyholders. So-called "patient portals" are common among healthcare websites. Patient portals permit a patient to access medical records, pay bills, seek information on insurance status, and renew medications, among other tasks. BCBS-MA calls its patient portal "MyBlue."

98. After the publication of the Markup Article highlighting the use of Meta Pixel on hospital websites, including patient portals, some healthcare companies removed all tracking technologies (including Meta Pixel and Google Analytics) from their patient portals. BCBS-MA, however, elected to maintain certain tracking technologies on its patient portal. BCBS-MA, therefore, continues to aid third parties, most notably Google and LinkedIn, in intercepting communications with actual policyholders of BCBS-MA.

99. BCBS-MA's MyBlue portal permits website users who have insurance policies with BCBS-MA to access their records and other personal information. Below is the login screen for MyBlue:



100. When a user accesses this login screen, that interaction reflects that the website user is likely an individual with a BCBS-MA policy. Hidden code that BCBS-MA injects into its website permits LinkedIn to intercept that communication and transmit certain of its contents to LinkedIn. The contents of the communication that LinkedIn intercepts are reflected below:




101. LinkedIn can use the website user's IP address to associate the intercepted communication with the individual's real-world identity known to LinkedIn, and then use that information—including the website user's probable status as a BCBS-MA patient, for LinkedIn's own commercial purposes.

102. Hidden code that BCBS-MA has injected into its website also permits Google to intercept the same communication, albeit through Google's "Doubleclick" advertising tracker, rather than the Google Analytics tracker, but in any event, the result is the same: Google intercepts the contents of the communication between BCBS-MA and the website user and can then use the substance of the intercepted communication for Google's own commercial purposes. The contents of the communication that Google intercepts are reflected below:



103. That is, hidden Google Doubleclick code that BCBS-MA injects into its website intercepts the communication through which a website user initiates a "login" into the "members" area of the BCBS-MA Website.

104. Based upon a review of an archived version of the BCBS-MA Website, before BCBS-MA removed Meta Pixel from its website on or around July 1, 2022, BCBS-MA injected similar hidden Meta Pixel tracking code into the login page for its MyBlue portal. The Meta Pixel tracker intercepted and transmitted to Facebook the fact that a particular individual (whom Facebook could identify) was accessing the login page of the BCBS-MA Website.

105. Even after a user successfully logs into the purpotedly "secure" area MyBlue portal, BCBS-MA continues to use Google's Doubleclick tracker on the user, which communicates to Google that the user is accessing an area of the website accessible only to BCBS-MA policyholders. When a user successfully signs in, the contents of that communication that Google intercepts are reflected below (with highlighting added):




106. That is, hidden Google Doubleclick code intercepts the communication through which a "Sign-in event" has occurred, communicating to Google that the individual is a policyholder with BCBS-MA, information that Google can then use for its own commercial purposes.

107. After the user is logged into the MyBlue patient portal, hidden code that BCBS-MA injects into its website continues to permit Google to track the individual's every move within the portal. For example, one option is for a user to view "My Plan," which provides information about that individual's insurance policy with BCBS-MA. When the user views "My Plan," that communication with BCBS-MA is intercepted by Google Doubleclick code, as reflected in the highlighted screenshot of network activity below:

```
Request URL: https://ad.doubleclick.net/activity;src=933
1827;type=;cat=;gtm=45fe32r0;auiddc=682634634.167518387
0;~oref=https%3A%2F%2Fchat.bluecrossma.com%2Fsystem%2Ft
emplates%2Fchat%2Fbcbsmyblue%2Findex.html%3FentryPointI
d%3D1005%26locale%3Den-US%26postChatAttributes%3Dtrue%2
6templateName%3Dbcbsmyblue%26ver%3Dv11%26subActivity%3D
Chat%26entryType%3DOTHER%26debug%3Dtrue%26wsname%3Dhttp
s%3A%2F%2Fmember.bluecrossma.com%26EGAIN_AV_CHAT_STATE_
DATA%3Dnull%26parentLost%3Dfalse%26referer%3Dhttps%253
A%252F%252Fmember.bluecrossma.com%252Fmyplans%26useCust
omButton%3Dundefined%26storage%3Dtrue%26docked%3Dtru
e?
Request Method: GET
Status Code: 302
Remote Address: 142.251.40.134:443
Referrer Policy: strict-origin-when-cross-origin
```

108. Similarly, if the users navigates to the area of the purportedly secure MyBlue portal where the user  can view the status of insurance claims, that communication is likewise intercepted by Google Doubleclick code, as reflected in the highlighted screenshot of network activity below:




109. If a user clicks to seek further information on a particular claim, the communication through which the user seeks to obtain more "claim detail" is likewise intercepted by Google Doubleclick code, as reflected in the highlighted screenshot of network activity below:



110. Similarly, if a user views information about his medications through the portal, that communication, too, is intercepted by Google Doubleclick code, as reflected in the highlighted screenshot of network activity below:

× Headers Preview Response Initiator Timing Cookies

▼ General

Request URL: https://ad.doubleclick.net/activity;src=9331827;type=;cat=;gtm=45fe32r0;auiddc=682634634.1675183870;~oref=https%3A%2F%2Fchat.bluecrossma.com%2Fsystem%2Ftemplates%2Fchat%2Fbcbsmyblue%2Findex.html%3FentryPointId%3D1005%26locale%3Den-US%26postChatAttributes%3Dtrue%26templateName%3Dbcbsmyblue%26ver%3Dv11%26subActivity%3DChat%26entryType%3DOTHER%26debug%3Dtrue%26wsname%3Dhttps%3A%2F%2Fmember.bluecrossma.com%26EGAIN_AV_CHAT_STATE_DATA%3Dnull%26parentLost%3Dfalse%26referer%3Dhttps%253A%252F%252Fmember.bluecrossma.com%252Fmymedications%26useCustomButton%3Dundefined%26storage%3Dtrue%26docked%3Dtrue?

Request Method: GET

Status Code: 302

Remote Address: 142.251.40.198:443

Referrer Policy: strict-origin-when-cross-origin

111. In addition to Google, Facebook, Twitter, and LinkedIn, BCBS-MA enabled the communications between healthcare consumers and BCBS-MA to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Kampyle.** Kampyle provides website analytics services similar to Google Analytics. Similar to Google Analytics and Meta Pixel, BCBS-MA inserted hidden code into their website that causes communications between the user and BCBS-MA to be intercepted by and transmitted to Kampyple. The contents intercepted include the URL and title of each website visited, the user's IP address, and detailed information about the website user's computer and browser configurations.

(b) **New Relic.** New Relic offers a "Browser Monitoring" analytics service that is similar to Google Analytics. Similar to Google Analytics and Meta Pixel, BCBS-MA, during the class period, inserted hidden code into their website that caused communications

between the user and BCBS-MA to be intercepted by and transmitted to New Relic at bam.nr-data.net. The contents intercepted include the URL of each webpage visited and the user's IP address, among other things.

(c) **Logrocket.** Logrocket is a so-called "session replay" provider that records a website user;s entire browsing experience through the BCBS-MA Website and then permits BCBS-MA to "replay" a particular individual's "session" on the website, including every mouse move, click, and page loaded on the website. BCBS-MA, during the class period, inserted hidden code into its website that implemented the Logrocket tracking technology.

**BCBS-MA's Interceptions of Plaintiff's Healthcare Communications on the MyBlue Portal**

112. During the Class Period, Plaintiff repeatedly and regularly communicated with BCBS-MA through the BCBS-MA Website. Most of her communications with BSBS-MA were made through the MyBlue Portal—the portion of the BCBS-MA Website on which the most sensitive patient communications occur about medical treatments and financial responsibility (by both BCBS-MA and Plaintiff) for such treatments. Plaintiff could only access the authenticated portions of the MyBlue Portal by logging into the portal with a username and password.

113. Plaintiff would begin communicating with BCBS-MA on the MyBlue Portal by first accessing the login page for the portal described above. BCBS-MA deployed Google DoubleClick and LinkedIn Insight on the MyBlue Portal login page accessed by Plaintiff throughout the Class Period; it deployed Meta Pixel on the MyBlue Portal login page until about July 1, 2022. When Plaintiff accessed the MyBlue Portal login page, BCBS-MA intercepted those communications using the tracking technologies and disclosed them to Google and LinkedIn (throughout the Class Period) and Facebook (until about July 1, 2022), so that BCBS-MA, Google, LinkedIn, and Facebook could subsequently use Plaintiff's intercepted communications on the MyBlue Portal login page for commercial and marketing purposes, including targeted advertising (such as BCBS-MA advertisements on Google, LinkedIn, and Facebook's online advertising platforms).

114. After Plaintiff logged into the patient portal, Plaintiff accessed webpages on the "authenticated" portion of the portal that were dynamically generated to provide information to Plaintiff about her own healthcare, medications, insurance coverage, and financial information relating to her healthcare, including both BCBS-MA's and Plaintiff's financial responsibility for such care. Before discovery, Plaintiff cannot know with certainty the full scope of BCBS-MA's deployment, on all dates during the Class Period, of tracking technologies on the dynamically generated pages Plaintiff accessed after logging into the patient portal, but Plantiff has confirmed that BCBS-MA deployed, at least, Google DoubleClick code throughout the MyBlue Portal, including the specific pages through which Plaintiff communicated with BSBS-MA, as described in this section, resulting in the interception of her communications and the disclosure of such intercepted communications to Google.

115. During the Class Period, Plaintiff regularly accessed the MyBlue Portal to obtain information about medical treatments Plaintiff was receiving, BCBS-MA's coverage for such medical treatments, and Plaintiff's financial responsibility for any such medical treatments.

116. Plaintiff accessed the MyBlue Portal to request from BCBS-MA and review what are known as Explanations of Benefits ("EOB"). BCBS-MA would generate EOBs in connection with the medical services, treatments, and procedures Plaintiff received through her medical providers. Specifically, when Plaintiff visited a medical provider, the medical provider provided services to Plaintiff, and Plaintiff would make a copayment. The medical provider would then submit a bill for services to BCBS-MA, called a claim. BCBS-MA then decides whether the claim is covered, and if so, BCBS-MA's financial responsibility for any medical services or treatment (including such considerations as considering the scope of health insurance coverage, the payment of copayments, deductibles, and any co-insurance). After BCBS-MA makes a coverage determination and pays (or does not pay) for some or all of the medical service or treatment, an EOB is issued, which explains

BCBS-MA's coverage decision, BCBS-MA's payments, and Plaintiff's financial responsibility for any such services or treatment.[7] EOBs can be accessed on the MyBlue Portal.

117. During the Class Period, Plaintiff regularly accessed the MyBlue Portal to access EOBs that reflected and disclosed her medical condition, the medical services and treatments she received for those medical conditions, and BCBS-MA's actions regarding claims for the medical services and treatments she received.

118. EOBs are financial documents that help patients track healthcare costs, verify billing accuracy, and understand insurance coverage. Reviewing them helps the patient check for errors like billing for services you didn't receive, double-billing, or incorrect amounts, and they allow the patient to monitor how much they have paid toward the patient's deductible or out-of-pocket maximum. EOBs are also necessary for appealing denied claims, disputing charges, and for tax or financial aid documentation. Plaintiff reviewed her EOB's through the MyBlue Portal for such purposes. The EOBs Plaintiff reviewed in the MyBlue Portal included information about the name of the providers, the types of services provided (such as hospital visits, medical procedures, medical tests), the amount covered by BCBS-MA insurance, and Plaintiff's financial responsibility for any such services.

119. The communications between Plaintiff and BCBS-MA regarding EOBs, including the specific communications described below, were protected by HIPAA. Under the HIPAA Privacy Rule, Private Health Information includes, among other things, communications that relate to "the past, present, or future payment for the provision of health care to an individual."[8] Plaintiff's EOBs related to the past, present, and future payments for the provision of health care to individuals. As

---

[7] BCBS-MA explains its process for EOBs in its "A Guide to Your Summary of Health Plan Payments," available at: https://www.bluecrossma.org/sites/g/files/csphws1866/files/acquiadam-assets/55-1305_Summary_Of_Health_Plan_Payments_Guide.pdf.

[8] 45 C.F.R. § 160.103.

described below, BCBS-MA's interception, disclosure, and subsequent use of Plaintiff's communications with BCBS-MA violated HIPAA.

120. BCBS-MA intercepted Plaintiff's communications between Plaintiff and BCBS-MA regarding EOBs described below for the primary purpose of committing criminal and tortious acts—namely, the unauthorized disclosure of healthcare communications, including communications that revealed Private Information, and the subsequent marketing use of the intercepted communications (*see* ¶¶ 133-57, 197-227, 236-47, *infra*, for an explanation for how the unauthorized disclosure and subsequent use of intercepted communications is both a criminal and tortious act). Indeed, there would have been no reason for BCBS-MA to embed and deploy Google DoubleClick on the BCBS-MA webpages Plaintiff visited inside the MyBlue Portal, where she accessed her EOBs, other than to intercept her private healthcare communications for marketing purposes, since DoubleClick is designed exclusively for managing and delivering digital ads.

121. In December 2022, Plaintiff experienced [REDACTED] She obtained [REDACTED] Shortly after [REDACTED], Plaintiff logged in to the MyBlue Portal and communicated with BCBS-MA to review the EOB BCBS-MA had generated [REDACTED], BCBS-MA's payment to her physicians, and Plaintiff's own financial responsibility [REDACTED].

122. When Plaintiff communicated with BCBS-MA through the BCBS-MA Website concerning [REDACTED], BCBS-MA intercepted those communications and shared them with Google and LinkedIn. It did so for the primary purpose of disclosing the intercepted communications (together with information identifying Plaintiff) to Google and LinkedIn, so that BCBS-MA, Google, and LinkedIn could subsequently use the intercepted communications for

commercial and marketing purposes, including targeted advertising directed to Plaintiff based on the content of the intercepted communications.

123. In February 2023, [REDACTED] Her physician primarily responsible for [REDACTED] After [REDACTED], in early 2023 (during the Class Period), Plaintiff communicated with BCBS-MA through the MyBlue Portal to review the EOB BCBS-MA had generated for [REDACTED], in order to determine BCBS-MA's coverage for [REDACTED], its payment to the hospital and her physicians, and to confirm her own financial responsibility for [REDACTED].

124. When Plaintiff communicated with BCBS-MA through the BCBS-MA Website concerning [REDACTED], BCBS-MA intercepted those communications and shared them with Google and LinkedIn. It did so for the primary purpose of disclosing the intercepted communications (together with information identifying Plaintiff) to Google and LinkedIn, so that BCBS-MA, Google, and LinkedIn could subsequently use the intercepted communications for commercial and marketing purposes, including targeted advertising directed to Plaintiff based on the content of the intercepted communications.

125. During the Class Period, Plaintiff had [REDACTED] Plaintiff had [REDACTED], and Plaintiff communicated with BCBS-MA through the MyBlue Portal during the Class Period to review payment and insurance information for treatments she had already received and to confirm eligibility for additional [REDACTED]. She obtained and reviewed the EOBs to ensure BCBS-MA was providing coverage for [REDACTED] had been paid, and to understand her own financial responsibility for [REDACTED].

126. When Plaintiff communicated with BCBS-MA through the BCBS-MA Website concerning [REDACTED], BCBS-MA intercepted those communications and shared them with Google, LinkedIn, and Facebook. It did so for the primary purpose of disclosing the intercepted communications (together with information identifying Plaintiff) to Google, LinkedIn, and Facebook, so that BCBS-MA, Google, LinkedIn, and Facebook could use the intercepted communications for commercial and marketing purposes, including targeted advertising directed to Plaintiff based on the content of the intercepted communications.

127. The examples provided above of Plaintiff's usage of the MyBlue Portal during the Class Period do not reflect a comprehensive record of all Plaintiff's communications with BCBS-MA through the MyBlue Portal during the Class Period. BCBS-MA possesses records of the communications Plaintiff had with BCBS-MA through the MyBlue Portal during the Class Period, which records Plaintiffs can obtain in the prosecution of this case in discovery.

128. BCBS-MA's specific interceptions of Plaintiff's communications with BCBS-MA described in this section, and the disclosures of such intercepted communications to Google, LinkedIn, and Facebook (together with information identifying Plaintiff) for subsequent use by those third parties and BCBS-MA for marketing purposes, including targeted advertising to Plaintiff, contradicted and breached BCBS-MA's promises to Plaintiff not to disclose or use such communications and identifying information regarding Plaintiff. *See* ¶¶ 28-32, *supra*.

129. Plaintiff never authorized BCBS-MA's interception, disclosure, or use for marketing of her healthcare communications or Personal Information, including the specific communications with BCBS-MA described in this section above.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

130. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the BCBS-MA Website's operation. The BCBS-MA Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

131. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with BCBS-MA via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

132. Moreover, even if BCBS-MA wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for BCBS-MA (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that BCBS-MA does not share the communications with others when it does; or (iii) to claim that BCBS-MA maintains the privacy of those communications when it does not.

**BCBS-MA Violated HIPAA and the FTC Act.**

133. Under federal law, a health insurance company may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[9]

134. Although health insurance companies regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or the Meta Pixel,

[9] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

135. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

136. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[10]

137. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"'; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic,

[10] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

138. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

139. The HIPAA Privacy Rule requires any "covered entity"—which includes health insurance companies—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

140. "Covered entities" include "a health plan," which in turn is defined includes health insurance issues such as BCBS-MA. 45 C.F.R. § 160.103.

141. An individual's status with a particular entity is PHI. The Department of Health and Human Services instructs covered entities that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[11]

142. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that

[11] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.10.

party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[12]

143. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[13]

144. In other words, the HHS has expressly stated that entities like BCBS-MA that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

145. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

146. Additionally, HHS has warned covered entities that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a

[12] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

[13] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

website. Instead, covered entities must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

147. The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

148. BCBS-MA's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

149. BCBS-MA is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

150. BCBS-MA's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties without their authorization.

151. BCBS-MA improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, and (c) patients' status as patients of BCBS-MA by using tracking technologies on webpages designed for patients, including the bill payment page.

152. For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on her health insurance, BCBS-MA permitted third parties to intercept Plainitff's protected information under HIPAA, notwithstanding that the pages are publicly accessible.

153. BCBS-MA improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. BCBS-MA disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as BCBS-MA policyholders, provider information, and appointment information.

154. BCBS-MA violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

155. BCBS-MA further violated other HIPAA regulations as follows:

(a) BCBS-MA failed to ensure the confidentiality and integrity of electronic PHI that BCBS-MA created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(b) BCBS-MA failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(c) BCBS-MA failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to BCBS-MA in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(d) BCBS-MA failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(e) BCBS-MA failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(f) BCBS-MA failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

156. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[14]

157. BCBS-MA's undisclosed use of tracking technologies on its website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, BCBS-MA's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

158. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[15]

159. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.

---

[14] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

[15] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

160. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

161. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[16]

162. Last year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[17]

---

[16] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[17] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

163. The American Medical Association's ("AMA") Code of Medical Ethics also amplifies the importance of protecting healthcare consumers' information. It creates rules protecting the privacy of patient data and communications.

164. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

165. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship.

166. AMA Code of Medical Ethics Opinion 3.3.2 provides: "Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored."[18]

**Plaintiff and Class Members Suffered Harm from BCBS-MA's Unlawful Interceptions and Disclosures of Plaintiff's and Class Member's Private Information**

167. As a direct and proximate cause of BCBS-MA's unauthorized interceptions and disclosures of Plaintiff's and Class Member's Private Information, Plaintiff and Class Members have been damaged by BCBS-MA's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

[18] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

(c) BCBS-MA denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used BCBS-MA's services or would have demanded compensation for BCBS-MA's use of their Private Information if they had known of BCBS-MA's practices;

(d) BCBS-MA eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Member's rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) BCBS-MA took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) BCBS-MA's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

## Class Action Allegations

168. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at bluecrossma.org between three years prior to the date of the filing of the initial complaint in this action and September 29, 2023.

169. This action is properly maintainable as a class action.

170. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

171. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and BCBS-MA, through the BCBS-MA Website, were electronic communications under the ECPA;

(b) Whether BCBS-MA inserted tracking technologies into the hidden code of the BCBS-MA Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the BCBS-MA Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BCBS-MA and users of the BCBS-MA Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BCBS-MA installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and BCBS-MA;

(g) Whether and to what extent BCBS-MA had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether BCBS-MA had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(i) Whether the promises made in BCBS-MA 's privacy statement either were or formed part of a contract between BCBS-MA and Plaintiff and Class Members;

(j) Whether BCBS-MA 's disclosure of Plaintiff's and Class Members' IHII and PHI breached BCBS-MA's promises set forth in its privacy statement, giving rise to liability for breach of contract;

(k) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of action to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

172. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the BCBS-MA Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

173. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff,

are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

174. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

175. BCBS-MA has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

### (Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)

176. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

177. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

178. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and BCBS-MA, through the BCBS-MA Website, were electronic communications under the ECPA.

179. The tracking technologies inserted into the hidden code of the BCBS-MA Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the BCBS-MA Website; (ii) Class Members' web browsers used to access the BCBS-MA Website; (iii) BCBS-

MA's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the BCBS-MA Website.

180. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BCBS-MA and users of the BCBS-MA Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

181. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, BCBS-MA configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and BCBS-MA, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and BCBS-MA), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputted by healthcare consumers. BCBS-MA also used tracking technologies on pages that would confirm to third parties such as Google and Facebook the user's likely status as BCBS-MA policyholders.

182. With respect to Plaintiff, the tracking technologies revealed information regarding Plaintiff's status as a BCBS-MA policyholder and her communications with BSBS-MA regarding her policy by revealing the substance of communications on BCBS-MA webpages on the MyBlue patient portal.

183. By inserting the computer code for Google Analytics, Meta Pixel, Twitter Pixel, LinkedIn Insight, and other tracking technologies, BCBS-MA intentionally intercepted, endeavored

to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

184. Additionally, through the above-described tracking technologies, after BCBS-MA intercepted communications, the intercepted information was, in turn, used by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

185. BCBS-MA facilitated the interception of communications between the Class Members and BCBS-MA, and BCBS-MA disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

186. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

187. BCBS-MA intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

188. Because of BCBS-MA's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Defendant does not qualify for the party exemption.

189. As alleged above, BCBS-MA violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

190. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

191. Plaintiff's Private Information that BCBS-MA disclosed to third parties qualifies as IIHI, and BCBS-MA violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). BCBS-MA used the intercepted electronic communications to increase its revenues.

192. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. BCBS-MA specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

193. BCBS-MA's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

194. BCBS-MA's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because BCBS-MA's use of the Facebook source code was for BCBS-MA's commercial advantage to increase revenue from existing patients and gain new patients.

195. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

196. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of BCBS-MA's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus

reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

**COUNT II**

**(Violation of Chapter 93A,
M.G.L. c. 93 §§ 2, 9, on behalf of the Class)**

197. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

198. BCBS-MA, Plaintiff, and Class Members are "persons" as meant by M.G.L. c. 93A § 1(a).

199. BCBS-MA is defined by Massachusetts statute as operating in the business of insurance, *see* M.G.L. c. 176D, and accordingly, is deemed to act in trade or commerce for purposes of Chapter 93A. *See Blue Cross & Blue Shield of Mass., Inc. v. Flexible Fundamentals, Inc.*, 2023 Mass. Super. LEXIS 40, at *3-6 (Super. Ct. May 3, 2023).

200. BCBS-MA advertised, offered, or sold goods or services in Massachusetts and engaged in trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by M.G.L. c. 93A § 1(b).

201. It is unfair and deceptive for a health insurer, particularly one entrusted with private, healthcare-related information and communications, to share healthcare consumers' healthcare-related communications with third parties without the express consent of the consumer.

202. The unfairness and deception in BSBS-MA's conduct were amplified by the false and misleading statements made on their consumer-directed website concerning how they handle communications with consumers through the website. As described above, BCBS-MA promised it would keep such information secure and confidential. BCBS-MA's promises included that any server logging performed on the website does **not** "capture any personally identifiable information," that consumers may use the website "anonymously," that any tracking is done for only "internal purposes,"

and that although the website uses "clear gifs," the website "doesn't collect any personal information from clear gifts" or information that "can be linked back to your personal information." These statements were deceptive because the tracking technologies BCBS-MA injected onto its website were designed to capture personally identifiable information, were designed to **de-**anonymize website users, were not used only for internal purposes (but were instead shared with third parties for their own use) and were designed to permit third parties to link intercepted communications back to individuals' real-world identities.

203. BCBS-MA's representations were material because they were likely to deceive reasonable consumers, including Plaintiff and Class Members, into believing that their Private Information would be kept confidential and would not be disclosed without their knowledge or consent.

204. BCBS-MA's acts and practices were additionally "unfair" because they fell within the penumbra of common law, statutory, and established concepts of unfairness, including concepts embedded in state and federal privacy law (including M.G.L. c. 111 § 70E and HIPAA), particularly given that BCBS-MA held the true facts about its unauthorized disclosures of Private Information to third parties.

205. BCBS-MA's conduct—the concealment of its use of tracking technologies—had no countervailing benefit to consumers or to competition. BCBS-MA had no reason to mislead Plaintiff and Class Members.

206. BCBS-MA's violations of Chapter 93A were done willfully, knowingly, and in bad faith.

207. As a direct and proximate result of BCBS-MA's conduct, Plaintiff and the members of the Class were injured in the various manners described in paragraph 167, *supra*, and they suffered damages as a result of each such injury.

208. Plaintiff sent BCBS-MA a written demand for relief pursuant to Chapter 93A, Section 9, identifying herself as the claimant (on behalf of the putative class) and reasonably describing the unfair and deceptive acts or practices relied upon and the injuries suffered, on December 20, 2024. BCBS-MA responded through counsel on January 17, 2025, rejecting the demand and refusing to make any offer to resolve the matter.

209. As a result of BCBS-MA's violation of Chapter 93A, Defendants are liable to Plaintiff and the Class for up to three times the damages that Plaintiff and the Class incurred, or at the very least the statutory minimum award of $25 per visit to the BSBS-MA Website during the Class Period, plus all court costs, attorneys' fees, and interest.

## COUNT III

### (Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)

210. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

211. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

212. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

213. BCBS-MA had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

214. Plaintiff and Class Members did not authorize Defendant to disclose their IHII to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment.

215. BCBS-MA distributed Plaintiff's and Class Members' Private Information to unauthorized third parties to market its services and increase profits, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, BCBS-MA's conduct reflected a public disclosure of private facts.

216. Additionally, BCBS-MA's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare insurers—in a manner that a reasonable person would deem highly offensive.

217. BCBS-MA's conduct constitutes an unreasonable and substantial invasion of the Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

218. Plaintiff and Class Members suffered injuries as a direct and proximate result of BCBS-MA's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

219. BCBS-MA's acts or omissions violate the Massachusetts Right to Privacy Act.

220. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 167, *supra*), plus costs and attorneys' fees.

## COUNT IV

## (Breach of Fiduciary Duty, on behalf of the Class)

221. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

222. A fiduciary relationship existed between BCBS-MA and Plaintiff. When it communicated with BCBS-MA through the BCBS-MA Website, Plaintiff reposed its trust and confidence in BCBS-MA to handle Plaintiff's confidential communications appropriately. Healthcare consumers in general repose trust in health insurers to maintain the confidentiality of the communications between the consumer and health insurer. Accordingly, when possessing nonpublic medical information, healthcare insurers such as BCBS-MA have a duty to keep such information completely confidential.

223. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to BCBS-MA through its website, which included highly sensitive Private Information. BCBS-MA's policies bolstered that expectation, given BCBS-MA's promises to Plaintiff that BCBS-MA would not disclose medical information and communications to third parties.

224. Contrary to its duties as a healthcare insurer and its express promises of confidentiality, BCBS-MA installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information, including information relating to their healthcare. BCBS-MA abused the trust given to it by Plaintiff and other class members to obtain an advantage for itself—that is, to barter for its own commercial gain the value of Plaintiff's sensitive communications.

225. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

226. BCBS-MA's secret and unauthorized disclosures of Plaintiff's Private Information constituted a breach of BCBS-MA's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

227. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 167, *supra*).

## COUNT V

## (Negligence, on behalf of the Class)

228. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

229. Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, BCBS-MA owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

230. BCBS-MA breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

231. It was reasonably foreseeable that BCBS-MA's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

232. BCBS-MA had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of consumers' healthcare information, set strict conditions under which providers may use such information, and limit to whom healthcare insurers can disclose such information.

233. BCBS-MA's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

234. BCBS-MA's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted negligence at common law.

235. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 167, *supra*), plus costs and attorneys' fees.

**COUNT VI**

**(Breach of Confidence, on behalf of the Class)**

236. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

237. Healthcare insurers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information based on the trust and confidence Plaintiff reposed in BCBS-MA to handle Plaintiff's confidential communications appropriately.

238. Healthcare insurers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

239. When possessing nonpublic medical information, health insurers such as BCBS-MA have a duty to keep such information completely confidential.

240. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to BCBS-MA through its website, which included highly sensitive Private Information. BCBS-MA's policies bolstered that expectation, given BCBS-MA's false promises to Plaintiff that BCBS-MA would collect website activity information only for "internal purposes" (i.e., not to benefit third parties) and that a user's website communications could not be "linked back to your personal information" (tracking technologies are designed to do precisely that).

241. In light of the special relationship between BCBS-MA and Plaintiff and Class Members, whereby BCBS-MA became a guardian of Plaintiff's and Class Members' Private Information, BCBS-MA had a duty to : (1) safeguard of Plaintiff's and Class Members' Private Information; (2) timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) maintain complete and accurate records of what patient information (and where) BCBS-MA did and does store and disclose.

242. Contrary to its duties as a health insurer and its express and implied promises of confidentiality, BCBS-MA installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with BCBS-MA and the contents of those communications, including Private Information.

243. BCBS-MA made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

244. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by BCBS-MA's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of BCBS-MA's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

245. BCBS-MA disclosed Plaintiff's and Class Members' Private Information to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

246. The harm arising from BCBS-MA's breach of confidentiality includes eroding the essential confidential relationship between the healthcare insurer and the consumer.

247. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 167, *supra*), plus costs and attorneys' fees.

**COUNT VII**

**(Breach of Contract, on behalf of the Class)**

248. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

249. BCBS-MA required Plaintiff and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the BCBS-MA Website as a condition of receiving healthcare insurance services. Plaintiff's and Class Member's provision of such Private Information provided consideration for BCBS-MA's provision of services through the BCBS-MA Website, including the provision of information and the use of the website to obtain medical services.

250. In so doing, Plaintiff and Class Members entered into contracts with BCBS-MA (or, in the alternative, implied contracts) by which BCBS-MA agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. BCBS-MA's contractual promises included that any server logging performed on the website does **not** "capture any personally identifiable information," that consumers may use the website "anonymously," that any tracking is done for only "internal purposes," and that although the website uses "clear gifs," the website "doesn't collect any personal information from clear gifts" or information that "can be linked back to your personal information."

251. Plaintiff and Class Members fully performed their obligations under the contract with BCBS-MA.

252. BCBS-MA breached its agreement with Plaintiff and Class Members by directly breaching its promises not to capture personally identifiable information or collect information in a manner that can be linked back to an individual's personal information (this is, in fact, the precise function of tracking technologies).

253. As a direct and proximate result of BCBS-MA's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private Information and have been denied the benefit of the bargain of their agreement with BCBS-MA.

254. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 167, *supra,* plus costs and attorneys' fees.

**COUNT VIII**

**(Unjust Enrichment, on behalf of the Class)**

255. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

256. This claim is pleaded in the alternative to Plaintiff's other causes of action.

257. BCBS-MA benefits from using Plaintiff's and Class Members' Private Information and unjustly retained those benefits at Plaintiff's and Class Members' expense.

258. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

259. BCBS-MA consciously collected and used this information for its own gain, providing BCBS-MA with economic, intangible, and other benefits, including substantial monetary compensation.

260. BCBS-MA unjustly retained those benefits at the expense of Plaintiff and Class Members because BCBS-MA's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

261. The benefits that BCBS-MA derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for BCBS-MA to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

262. Had BCBS-MA informed Plaintiff that it collected and shared Plaintiff's Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of BCBS-MA's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

263. The Court should compel BCBS-MA to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that BCBS-MA unjustly received and such other relief as the Court may deem just and proper.

## **Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 31, 2025

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

*/s/ Patrick J. Vallely*
Patrick J. Vallely